## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| CLAUDETTE RHONE, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 24-3389 (RC) |
| | : | | |
| v. | : | Re Document No.: | 7 |
| | : | | |
| MARCO A. RUBIO, | : | | |
| | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

### GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

## I.  INTRODUCTION

Plaintiff Claudette Rhone, an African-American woman employed as an Equal Employment Opportunity ("EEO") Specialist at the Department of State ("Department" or "Defendant"), brings this action for employment discrimination, retaliation, and hostile work environment in violation of Title VII of the Civil Rights of 1964, 42 U.S.C. §§ 2000e *et seq.*, against Marco A. Rubio, in his official capacity as the Secretary of State.  Plaintiff alleges that she suffered discrimination and a hostile work environment based on her race, as well as retaliation for her prior protected EEO activity.  Defendant has filed a partial motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), arguing that Plaintiff's claims should be dismissed for failure to state a claim, except for her claim that she was not selected for an EEO Lead Specialist position because of her race.  For the reasons below, the Court grants the motion in part and denies it in part.

## II.  FACTUAL BACKGROUND

Plaintiff Claudette Rhone is an African-American woman diagnosed with attention deficit hyperactivity disorder and anxiety who was employed as an EEO Specialist within the

Department of State's Office of Civil Rights ("OCR" or "S/OCR") from approximately 2016 and at all relevant times thereafter.  Compl. ¶¶ 2, 6–9, 19.  Plaintiff alleges that the Department subjected her to discrimination and a hostile work environment because of her race,[1] causing her "significant humiliation, embarrassment, [and] emotional distress."  *Id.* ¶¶ 3, 109.  She further alleges that she suffered retaliation for engaging in protected EEO activities, including "oppos[ing] discriminatory practices against Black women" in OCR in May 2020 and filing an EEO complaint around May 15, 2023.  *Id.* ¶¶ 53–56.

Plaintiff's alleged troubles began around February 2017, when two supervisors, Glenn Budd and Gregory Smith, informed her that she had to resign as Vice President of the employee affinity group Blacks in Government ("BIG")[2] "because of a policy decision made by S/OCR leadership."  *Id.* ¶¶ 44, 46–47.  As a result of her forced resignation, "Plaintiff suffered [a] loss of career and advancement opportunities."  *Id.* ¶ 51.  Years later, around May 2023, Plaintiff learned that "a White employee from S/OCR, AJ, was listed as a board member at Executive Women at State," another affinity group, "contrary to the directive given to Plaintiff by S/OCR leadership" and allegedly with the consent of OCR leadership.  *Id.* ¶¶ 49–50.  "A similarly situated Black employee, K-AY, was also asked to resign as a board member of an Employee Affinity Group."  *Id.* ¶ 52.

Plaintiff alleges another discriminatory incident in May 2023, when she was not selected to be an EEO Lead Specialist.  *Id.* ¶ 39.  The Department posted openings for five of these

---

[1] In addition to her race-based claims, Plaintiff initially pleaded claims of discrimination and hostile work environment based on her sex and disability, but she has since "voluntar[ily] removed" those claims.  *See* Pl.'s Opp'n to Def.'s Mot. Dismiss at 6 n.2 ("Pl.'s Opp'n"), ECF No. 10.

[2] Plaintiff does not describe the nature of this organization in her complaint but both she and Defendant describe it as an "employee affinity group" in their papers.  *See* Pl.'s Opp'n at 3; Def.'s Mot. Dismiss at 2 ("Def.'s Mot."), ECF No. 7.

positions across three teams around April 11, 2023. *Id.* ¶¶ 25–28. Plaintiff applied for the openings and her first-level supervisor, Erica Solloso, extended her an interview. *Id.* ¶ 35. She then interviewed with three Department officials, Paige Williams, Calli Fuller, and Robert Shinn, at which point she indicated that she would like to be considered for all five positions. *Id.* ¶¶ 36–38. Plaintiff "had seniority over each selectee," "had received excellent performance evaluations for 8 years," and "was more qualified than each selectee." *Id.* ¶¶ 40–41. However, on May 15, 2023, Ms. Solloso informed Plaintiff that she was not selected to be a Lead Specialist. *Id.* ¶ 39. One of the positions "was offered to a less qualified Caucasian/White woman." *Id.* ¶ 42.

Plaintiff also complains that beginning in 2020, Ms. Solloso and Margaret Phillips, another supervisor, subjected her to "unreasonable workloads of over 50 active cases." *Id.* ¶ 57. This workload included cases from a retiree, "resulting in Plaintiff working weekends without pay." *Id.* At another point in her complaint, Plaintiff alleges that despite her "excessive workload" while she worked with the "formal team," Ms. Solloso and Mr. Budd denied her requests for workload assistance. *Id.* ¶ 81. A Deputy Director[3] and Director also denied her requests for assistance yet approved her "White colleague[s']" requests for assistance. *Id.* ¶¶ 81–84. What's more, when Plaintiff's "White colleagues" complained about their excessive workload, the Department responded by hiring additional harassment investigators and encouraging OCR employees to assist with harassment complaints. *Id.* ¶¶ 86–88.

Around September 27, 2023, Plaintiff took emergency medical leave "because of the discrimination and hostile work environment" she faced. *Id.* ¶ 65. Before going on leave, a Department official, Elizabeth Williams, demanded that Plaintiff provide status reports for over

---

[3] Plaintiff alleges that the Deputy Director, "GB," denied her requests for workload assistance, and notes elsewhere in her complaint that Glenn Budd was the Deputy Director in 2023. Compl. ¶¶ 33, 81–82. The Court assumes that "GB" refers to Glenn Budd.

one hundred cases within twenty-four hours, despite a prior "understanding" that she would submit this information before she went on leave. *Id.* ¶¶ 65–69. While on leave, she was assigned seventeen new cases and listed as the point of contact on each case, causing her "distress." *Id.* ¶¶ 75–79. In contrast, her "similarly situated colleagues, with no prior EEO activity, were not assigned cases while . . . out on emergency medical leave." *Id.* ¶ 80. Furthermore, Ms. Solloso and Ms. Phillips emailed her while she was on leave with instructions to draft a dismissal letter for a case and to close out another case. *Id.* ¶¶ 75–76.

Plaintiff describes a litany of other workplace grievances going back to 2021, including several unpleasant interactions with her supervisors. For example, Ms. Solloso "chastised" Plaintiff for raising a work-related inquiry around July 2021, which Plaintiff notes occurred "after [she] engaged in prior protected EEO activity." *Id.* ¶¶ 89–90. Ms. Solloso also "chastise[d]" her during a June 2023[4] meeting that Plaintiff joined despite being on approved sick leave. *Id.* ¶¶ 63–64. During a July 2023 Teams call, "after Plaintiff engaged in prior protected EEO activity," Ms. Phillips "berated" her by rolling her eyes, raising her voice, and refusing Plaintiff's requests to end the call. *Id.* ¶¶ 91–101. Ms. Solloso dismissed Plaintiff's complaints about that call. *Id.* ¶¶ 102–05. And around October 2024, Ms. Phillips refused Plaintiff's request for copies of a PowerPoint presentation and pop quiz she had been required to take, despite needing this information as evidence for the EEO complaint she had filed earlier that year. *Id.* ¶¶ 60, 106–08.

---

[4] Plaintiff states in her complaint that this meeting occurred in June 2022 but clarifies in her Opposition that it occurred in 2023. *See* Compl. ¶ 61; Pl.'s Opp'n at 9.

### III.  LEGAL STANDARD

A motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)), and to "give the defendant fair notice of what the claim is and the grounds upon which it rests," *Twombly*, 550 U.S. at 545 (citation omitted).  A claim becomes facially plausible once "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

In ruling on a motion to dismiss, a court must "constru[e] the complaint liberally in the plaintiff's favor," accepting all factual allegations as true and affording the plaintiff "the benefit of all reasonable inferences derived from the facts alleged." *Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006).  However, a court need not accept a complaint's "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678.  "Courts in this Circuit have consistently recognized the ease with which a plaintiff claiming employment discrimination can survive a motion to dismiss." *McNair v. District of Columbia*, 213 F. Supp. 3d 81, 86 (D.D.C. 2016) (citation modified).

### IV.  ANALYSIS

Based on the factual allegations above, Plaintiff advances claims of race discrimination, retaliation, and hostile work environment under Title VII.  Defendant contends that most of Plaintiff's complaint should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6), because, apart from Plaintiff's allegation that she was not selected for a Lead Specialist position

on account of her race,[5] her remaining allegations fail to state claims upon which relief can be granted.  The Court largely agrees with Defendant.  However, the Court holds that in addition to Plaintiff's discriminatory non-selection claim, her claim that her supervisors forced her to resign from a leadership position of an employee affinity group because of her race also withstands Defendant's motion to dismiss.  The Court will address Plaintiff's race discrimination, retaliation, and hostile work environment claims in turn.

### A.  Race Discrimination

Defendant moves to dismiss most of Plaintiff's race discrimination claims for failure to state a claim, except for the non-selection claim discussed above, which Defendant denies but assumes is sufficiently pled to survive its motion to dismiss.  *See* Def.'s Mot. at 2.  To state a claim of discrimination under Title VII, a plaintiff must plausibly allege that (1) she "suffered an adverse employment action" (2) "because of [her] race, color, religion, sex, [or] national origin." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008).  Defendant argues that Plaintiff's race discrimination claims fail because Plaintiff's alleged workplace grievances do not amount to "adverse employment actions" and because Plaintiff fails to allege a causal connection between the conduct she complains about and her race.  *See* Def.'s Mot. at 2.  The Court agrees with Defendant as to all alleged grievances except for Plaintiff's allegation that she was forced to resign from an affinity group leadership role because of her race.

---

[5] Because Defendant has not challenged Plaintiff's discriminatory non-selection claim, the Court will allow the claim to proceed.

1.  Applicable Law

*a. Adverse Employment Action*

Title VII discrimination claims require a showing of an "adverse employment action." *Baloch*, 550 F.3d at 1196.  The Supreme Court recently clarified that this requirement is met once the plaintiff alleges "some harm respecting an identifiable term or condition of employment."  *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346, 347 (2024).  In other words, the plaintiff must show "some 'disadvantageous' change in an employment term or condition," but the attendant harm experienced by the plaintiff need not be "significant" or "otherwise exceed[] some heightened bar."  *Id*.  The phrase "employment term or condition" is "not used in the narrow contractual sense; it covers more than the economic or tangible."  *Id.* at 354 (citation modified).  *Muldrow* aligns with the D.C. Circuit's decision in *Chambers v. District of Columbia*, which held that an employee alleging an "adverse employment action" no longer needed to "make a separate showing of 'objectively tangible harm,'" as prior Circuit precedent had required.  35 F.4th 870, 880 (D.C. Cir. 2022) (en banc).

Defendant contends, however, that *Muldrow*'s and *Chambers*'s holdings are limited to suits against private-sector employers and state and local government employers.  *See* Def.'s Mot. at 5.  Because Plaintiff's suit is against the federal government, Defendant maintains that the Court should apply the "personnel action" definition from the Civil Service Reform Act ("CSRA") to determine whether Plaintiff's alleged discriminatory conduct constitutes an "adverse employment action."  *Id.*  Defendant's argument seizes on slight differences in the language that Title VII uses to describe prohibited discriminatory practices in the private and federal sectors.  Whereas the provision applicable to private and non-federal government employers outlaws discrimination with respect to an individual's *"compensation, terms,*

*conditions, or privileges of employment*, because of such individual's race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(a)(1) (emphasis added), the provision applicable to federal employers requires that "[a]ll *personnel actions* affecting employees . . . be made free from any discrimination based on race, color, religion, sex, or national origin," *id.* § 2000e-16(a) (emphasis added).  Title VII does not define "personnel actions," but the CSRA defines this term to include certain enumerated employment-related actions, such as appointments, promotions, and disciplinary actions, as well as other unenumerated "change[s] in duties, responsibilities, or working conditions," but only if these are "significant."  *See* 5 U.S.C. § 2302(a)(2)(A).  In *Babb v. Wilkie*, the Supreme Court observed that the CSRA's definition of "personnel action" is "consistent with the term's meaning in general usage," and assumed that it had the same meaning in the federal-sector provisions of the Age Discrimination in Employment Act ("ADEA"), which mirror those of Title VII.  589 U.S. 399, 405 (2020).

Invoking *Babb* and the CSRA, Defendant concludes that for conduct to be actionable under Title VII's federal-sector provisions, it "must either be an enumerated 'personnel action' under the [CSRA] or fall into that term's catch all[,] i.e., 'any other significant change in duties, responsibilities, or working conditions.'"  Def.'s Mot. at 8 (quoting 5 U.S.C. § 2302(a)(2)(A)(xii)).  And because *Muldrow* (and *Chambers*) interpreted the private-sector provisions of Title VII, Defendant insists that *Muldrow*'s more plaintiff-friendly standard—requiring only a showing of "some harm respecting an identifiable term or condition of employment," as opposed to a "significant change in duties, responsibilities, or working conditions"—is inapplicable here.  *See id.*

This Court, like others in this District, rejects Defendant's efforts to cabin *Muldrow* and *Chambers* to private-sector Title VII suits.  *See Wilson v. Noem*, No. 20-cv-100, 2025 WL

1000666, at *22 (D.D.C. Apr. 3, 2025) (collecting cases).  Defendant counters that doing so runs

afoul of *Babb*.  *See* Def.'s Mot. at 8.  In *Babb*, the Supreme Court declined to construe the

federal-sector and private-sector provisions of the ADEA coterminously, holding that differences

in their language warranted imposing a lower standard of causation for proving age

discrimination for federal employees than for private-sector employees.  589 U.S. at 410.

According to Defendant, *Babb* thus stands for the proposition that "when anti-discrimination

statutes use different language in their federal and non-federal provisions, they should not be

interpreted the same."  Def.'s Mot. at 8.  The Court is not convinced.  Notwithstanding the "usual

rule that when the legislature uses certain language in one part of the statute and different

language in another, the court assumes different meanings were intended," *DePierre v. United

States*, 564 U.S. 70, 83 (2011) (citation modified), the D.C. Circuit has "long and repeatedly held

that the federal-sector provisions [of Title VII] are coterminous with their private-sector

counterparts as far as the standard for an adverse action goes," *Bain v. Off. of Att'y Gen.*, 648 F.

Supp. 3d 19, 53 (D.D.C. 2022).  And when the D.C. Circuit modified that standard in *Chambers*,

"it did not so much as hint" that the two provisions "should no longer be construed alike."  *Id.*

at 54; *see also Doe v. Austin*, No. 22-cv-3474, 2024 WL 864270, at *10 (D.D.C. Feb. 29, 2024).

Absent any contrary directive from the D.C. Circuit, this Court will thus apply *Muldrow* and

*Chambers* to Plaintiff's discrimination claims.  *See Cameron v. Blinken*, No. 22-cv-0031, 2023

WL 5517368, at *4 (D.D.C. Mar. 22, 2023) ("Because it remains binding Circuit law that Title

VII's public and private sector provisions contain identical prohibitions, *Chambers* governs

here." (internal quotation marks omitted)).

*b. Causal Connection*

A race discrimination claim also requires the plaintiff to establish a causal connection between the "adverse employment action" and her race. To do so, the plaintiff must allege that the motive to discriminate based on race was "one of the employer's motives, even if the employer also had other, lawful motives for the decision." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 343 (2013). Although the "initial burden" of pleading causation is "not onerous," *Keith v. U.S. Gov't Accountability Off.*, No. 21-cv-2010, 2022 WL 3715776, at *3 (D.D.C. Aug. 29, 2022), the plaintiff "must allege some facts that demonstrate [her] race was [one of] the reason[s] for defendant's actions," *Doe #1 v. Am. Fed'n of Gov't Emps.*, 554 F. Supp. 3d 75, 102 (D.D.C. 2021) (citation modified). Absent direct evidence of discrimination, a plaintiff can satisfy this burden at the pleading stage "by showing that she was treated differently from similarly situated employees who are not part of the protected class." *See Ananth v. Turner*, No. 23-cv-2262, 2025 WL 973470, at *9 (D.D.C. Mar. 31, 2025) (citation modified).

2. Merits

The Court will consider whether Plaintiff's factual allegations establish the adverse-action and causation elements necessary for her Title VII discrimination claims. These allegations concern Plaintiff's claims that Defendant discriminated against her because of her race by: (a) forcing her to resign from a leadership position of an employee affinity group; (b) assigning her unreasonable workloads; (c) denying her requests for workload assistance; and (d) chastising, berating, reprimanding, or otherwise criticizing her on repeated occasions.

*a. Forced Resignation from an Affinity Group*

Plaintiff asserts that around February 2017, two supervisors, Glenn Budd and Gregory Smith, required her to resign as Vice President of Blacks in Government ("BIG") "because of a

policy decision made by S/OCR leadership" yet, in 2023, a White employee at OCR was permitted to remain on the board at Executive Women at State, another employee affinity group. *See* Compl. ¶ 44–52.  Defendant argues that the limitation imposed on Plaintiff's leadership role is not actionable as an "adverse employment action" because that role "was not part of her job description or responsibilities," Def.'s Mot. at 9, and that Plaintiff has not connected this claim to her race, *see id.* at 9, 12.  Although a close question, the Court concludes that this claim survives Defendant's motion to dismiss.

Turning to Defendant's first argument, an adverse action in the discrimination context need not specifically affect an employee's "job description or responsibilities," as Defendant suggests, *see id.* at 9, but must simply relate to "terms, conditions, or privileges of employment," *see Chambers*, 35 F.4th at 874.  As the D.C. Circuit explained in *Chambers*, the statutory phrase "terms, conditions, or privileges of employment," 42 U.S.C. § 2000e-2(a)(1), is "capacious" and intended to "strike at the entire spectrum of disparate treatment in employment," *Chambers*, 35 F.4th at 874 (citation modified) (quoting *Meritor Savs. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)).  Nevertheless, "not everything that happens at the workplace affects an employee's 'terms, conditions, or privileges of employment.'"  *Id.*

In a case presenting facts similar to those here, the Tenth Circuit agreed with the district court in a nonprecedential opinion that the plaintiff, an African-American woman who worked as an EEO Complaints Specialist at an air force base, had not met her burden of proving her Title VII discrimination claim based on her supervisor's demand that she resign as Treasurer of BIG. *See Nephew v. Rice*, No. 92-cv-6083, 1993 WL 137102, at *2 (10th Cir. Apr. 23, 1993) (unpublished).  The Tenth Circuit centered its analysis on the plaintiff's failure to establish that similarly situated employees outside of her protected class were treated differently, without

opining on whether a limitation on holding a leadership role of an employee affinity group is an actionable harm for purposes of a Title VII discrimination claim. *Id.*

The Court is not aware of any precedent considering that specific question. And "given the primacy of the objective-tangible-harm inquiry prior to *Chambers*," few cases in this Circuit "focused on the contours" of the phrase "terms, conditions, or privileges of employment." *Liu v. Georgetown Univ.*, No. 22-cv-157, 2022 WL 2452611, at *6 (D.D.C. July 6, 2022); *see also Doe*, 2024 WL 864270, at *11. Since *Chambers*, though, courts in this District have interpreted this phrase to embrace actions unrelated to an employee's formal job-related duties and responsibilities when such actions nevertheless impacted discernable aspects of an employee's working conditions, professional opportunities, or potential for career advancement. *See, e.g.*, *Liu*, 2022 WL 2452611, at *6 (deeming the opportunity to present research at a professional conference to be a "privilege" of employment as an academic researcher); *Doe*, 2024 WL 864270, at *11 (recognizing as actionable an employer's demands that a Chinese-American intelligence officer sign a sworn statement of allegiance and attend meetings with security officials, as this "accusatory employer conduct" could have "inhibited the Plaintiff's potential for career advancement" (citation modified)).

Here, the Court finds that it would be premature at this juncture to conclude, as a matter of law, that being forced to resign from a leadership position of an employee affinity group is not actionable as an "adverse employment action" in a Title VII discrimination claim. Although perhaps not as evident as, say, the right of an academic to present his research at a professional conference, the right of an employee to join and hold a leadership position in an employee affinity group could similarly be construed as a "privilege" of employment. *See Liu*, 2022 WL 2452611, at *6 (defining "privilege" as a "right . . . granted as a peculiar benefit, advantage, or

favor, *especially*: such a right . . . attached specifically to a position or an office" (quoting Privilege, Merriam-Webster, https://www.merriam-webster.com/dictionary/privilege (last visited September 12, 2025))).  The Court cannot infer from Plaintiff's complaint, however, that participation in an employee affinity group was a right that flowed from Plaintiff's employment, as Plaintiff has not alleged facts bearing on the organizational nature of BIG or its association with the Department of State.  Nevertheless, Plaintiff has pleaded that because she was "forced to retire as the Vice President of BIG," she "suffered [a] loss of career and advancement opportunities."  Compl. ¶ 51.  This is a reasonable inference.  *See Diemert v. City of Seattle*, 776 F. Supp. 3d 922, 949 (W.D. Wash. 2025) (noting that racial affinity groups "can foster a sense of belonging and respect that advances equity in the workplace and improves the bottom-line").  And although admittedly lacking in specifics, this allegation is sufficient to put Defendant on "fair notice" of the nature of Plaintiff's claim; specifically, that Defendant's demand that Plaintiff resign from BIG inhibited her potential for career advancement and thus affected a term or condition of her employment.  *See Twombly*, 550 U.S. at 545; *Doe*, 2024 WL 864270, at *11.

Plaintiff has also plausibly alleged a causal connection between her forced resignation from BIG and her race.  Plaintiff states in her complaint that she discovered around May 2023 that "a White employee from S/OCR, AJ, was listed as a board member at Executive Women at State," Compl. ¶ 49, and that "[a] similarly situated Black employee, K-AY, was also asked to resign as a board member of an Employee Affinity Group," *id.* ¶ 52.  Although the latter allegation is deficient, *see Doe#1*, 554 F. Supp. 3d at 103 ("A plaintiff's assertion that . . . she is similarly situated to others is just a legal conclusion." (citation omitted)), the former contains just enough detail to ground a reasonable inference that "AJ," who was an S/OCR employee like Plaintiff, and thus conceivably subject to the same OCR "policy decision" pursuant to which

Plaintiff was forced to resign from BIG, is an appropriate comparator for Plaintiff's forced-resignation claim, *see Joyner v. Morriston & Foerster LLP*, 140 F.4th 523, 530 (D.C. Cir. 2025) (explaining that there is no "mechanical formula" for determining whether "a plaintiff proceeding on only a comparator theory [has] plead[ed] enough facts about those comparators" to raise an inference of discrimination, and that in making this determination, a court must consider "the specific context of each case").  Defendant does not directly challenge Plaintiff's identification of "AJ" as a comparator.  Instead, it suggests that the Department had a "valid and non-pretextual basis" to ask Plaintiff to resign from an affinity group; namely, "the desire to avoid confusion with official statements by the Department" given Plaintiff's position as an EEO Specialist.  *See* Def.'s Mot. at 12.  That may be.  But at the pleading stage, "an employment discrimination plaintiff need not anticipate legitimate, non-discriminatory reasons that may be proffered by the employer for the adverse employment action nor allege pretext to survive a motion to dismiss."  *Townsend v. United States*, 236 F. Supp. 3d 280, 298 (D.D.C. 2017).

    Because Plaintiff has plausibly alleged an adverse employment action and a nexus between that action and her race, her claim that her forced resignation from BIG constituted racial discrimination in violation of Title VII withstands Defendant's motion to dismiss.  Of course, as this case progresses through further pleadings or discovery, Plaintiff will need to "flesh out the exact significance of the lost opportunity [to lead an affinity group] and its relationship to [her] job responsibilities," as well as the causation element, in order to advance her claim.  *See Liu*, 2022 WL 2452611, at *6.

### b.  Unreasonable Workload

    Plaintiff alleges that two supervisors, Ms. Solloso and Ms. Phillips, began assigning her "unreasonable workloads" in 2020.  Compl. ¶ 57.  She also complains about receiving

"unreasonable" assignments in the latter half of 2023, around the time she took emergency medical leave. *Id.* ¶¶ 65–79. Before she went on leave, another supervisor, Elizabeth Williams, required her to provide status reports for over one hundred cases within twenty-four hours. *Id.* ¶¶ 66–70. Furthermore, while she was on leave, she was assigned seventeen new cases, and Ms. Solloso and Ms. Phillips both emailed her with separate work requests. *Id.* ¶¶ 75–79. Defendant argues that none of Plaintiff's alleged changes in workload constitute "adverse employment actions" and that Plaintiff has not alleged a causal connection between such changes and her race. Def.'s Mot. at 8–9. The Court agrees only as to the latter point.

Drawing all reasonable inferences in Plaintiff's favor, as the Court must do at the pleading stage, Plaintiff's allegations are sufficient to conclude that she suffered an "adverse employment action" in connection with at least some of her work assignments. When an employee's increased workload "negatively impact[s] her work environment," the employee suffers "some harm" to an employment term or condition. *See Mitchell v. Garland*, No. 23-cv-2412, 2024 WL 3251217, at *4 (D.D.C. July 1, 2024) (quoting *Muldrow*, 601 U.S. at 355); *see also Bain*, 648 F. Supp. 3d at 56 ("An employee who receives a manageable amount of desirable work has superior working conditions to those of an employee assigned a crushing load of work."). Here, Plaintiff alleges that her increased workload of over fifty active cases since 2020 forced her to work weekends without pay, that Ms. Williams's demand for status reports within twenty-four hours before Plaintiff went on leave in 2023 contravened a prior "understanding" of a longer timeline for the task, and that being assigned seventeen new cases during her leave, while being listed as the point of contact on the cases, caused her "distress." Compl. ¶¶ 57, 65–70, 77–79. These allegations suggest that these work assignments "negatively impact[ed] [Plaintiff's] work environment," thus making them "adverse employment actions." *See Mitchell*,

2024 WL 3251217, at *4 (holding that requiring an employee to work on holidays meets the "some harm" standard).  Plaintiff's other workload-related allegations miss the mark, however. The Court cannot infer, for example, that Ms. Solloso's and Ms. Phillips's emails to Plaintiff while she was on leave with instructions to dismiss or close out cases caused "some harm" to a term or condition of Plaintiff's employment.  Without more detail, these emails strike the Court as one-off requests that did not necessarily entail a negative impact to her work environment.

Defendant disagrees that any of Plaintiff's alleged changes in workload constitute adverse employment actions, arguing that "[c]hanges in assignments or work-related duties" are not actionable "if unaccompanied by a decrease in salary or work hour changes."  Def.'s Mot. at 10 (citing *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1557 (D.C. Cir. 1997)).  But a work assignment that forces an employee to work weekends without pay, for one, would seem to involve a "decrease in salary or work hour changes."  In any event, Defendant describes the pre-*Chambers* rule.  *See Bain*, 648 F. Supp. 3d at 56 (noting that *Chambers* rejected the *Mungin* rule).  As *Chambers* made clear, Title VII "admits of no distinction between 'economic' and 'non-economic' discrimination or 'tangible' and 'intangible' discrimination."  35 F.4th at 874.

Even though some of Plaintiff's alleged changes in workload constitute adverse employment actions, the Court must dismiss her workload-related discrimination claims because she has not alleged facts raising an inference of discrimination with respect to her increased workload.  First, Plaintiff's allegations do not suggest that Ms. Solloso and Ms. Phillips assigned her "unreasonable workloads" since 2020 because of racial animus.  Plaintiff admittedly alleges that Ms. Solloso extended her an interview for the Lead Specialist positions in 2023 and that one of the positions was offered to a less qualified White woman.  Compl. ¶¶ 35, 39, 42.  But even if these allegations raise an inference of discrimination with respect to Plaintiff's non-selection

claim, and although a similar inference could perhaps be raised with respect to other actions Ms. Solloso might have taken against Plaintiff around that time, Plaintiff does not explain what bearing, if any, Ms. Solloso's participation in the Lead Specialist selection process in 2023 had on the work she began assigning Plaintiff three years earlier. *Cf. Petty v. Delaware River & Bay Auth.*, No. 10-cv-054, 2014 WL 4446172, at *6 (D. Del. Sept. 8, 2014) (noting that evidence of a discriminatory act does not "give rise to an inference of discrimination if [it is] too far attenuated from an adverse employment decision," including if it is removed by several years from that decision). Second, Plaintiff does not allege facts suggesting that Elizabeth Williams gave her an impossible research assignment before Plaintiff took medical leave because of her race. Indeed, Plaintiff does not reference Ms. Williams elsewhere in her complaint.[6] Third, although Plaintiff alleges that she took medical leave "because of the discrimination and hostile work environment" she faced, she does not allege which supervisors assigned her new cases while she was on leave, whether these supervisors were aware of the reason for her leave, or other details and context that might otherwise raise an inference of discrimination with respect to such assignments. Compl. ¶ 65.

### c. Denial of Requests for Assistance

Plaintiff alleges that her supervisors discriminated against her because of her race by denying her requests for workload assistance while approving her "White colleague[s']" requests. Compl. ¶¶ 81–88. The Court finds these allegations deficient for lack of factual support. *See Iqbal*, 556 U.S. at 678. Plaintiff has not alleged facts, besides a conclusory note that she requested assistance due to "excessive workload," regarding the circumstances that led

---

[6] At other points in her complaint, Plaintiff references supervisor Paige Williams. *See, e.g.*, Compl. ¶¶ 15, 36, 56. The Court assumes Paige Williams and Elizabeth Williams are separate individuals.

her to request assistance or how the denial of her requests impacted her working conditions, for example, that would permit the Court to assess whether Plaintiff suffered an "adverse employment action." Furthermore, even assuming that these denials can support a discrimination claim, Plaintiff has not plausibly alleged a nexus to her race. Her assertion that her "request for the workload assistance was denied based on race" is nothing more than a "legal conclusion couched as a factual allegation," which the Court is not bound to accept. *Twombly*, 550 U.S. at 555 (citation omitted); *see also Doe #1*, 554 F. Supp. 3d at 102 (noting that the plaintiff "cannot merely invoke his race in the course of a claim's narrative" to avoid dismissal (citation modified)). And although Plaintiff notes that her "White colleague[s']" requests for assistance were approved, she alleges no facts about, for example, their titles, job duties, or even their office within the Department of State to ground an inference that these individuals were similarly situated comparators. *See Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015) ("Factors that bear on whether someone is an appropriate comparator include the similarity of the plaintiff's and the putative comparator's jobs and job duties."). Without more, Plaintiff's reference to White "colleagues" is "fatally nonspecific." *See Doe #1*, 554 F. Supp. 3d at 103. The Court therefore dismisses Plaintiff's discrimination claim based on her allegations that her supervisors denied her requests for assistance. ¶

### d. Unpleasant Workplace Interactions

Plaintiff narrates a host of unpleasant workplace interactions, including that her supervisors "chastise[d]," "berate[d]," and raised their voice at her during several work calls, and then dismissed her complaints about this "harassing conduct." Compl. ¶¶ 63–64, 89–105. However, these allegations, as currently pleaded, suggest that Plaintiff's supervisors' conduct, at most, amounts to the sort of "'rude and disrespectful' behavior that courts have 'consistently

held' fail to give rise to a discrimination claim." *Keith v. U.S. Gov't Accountability Off.*, No. 21-cv-2010, 2023 WL 6276635, at *6 (D.D.C. Sept. 26, 2023) (quoting *Taylor v. Haaland*, No. 20-cv-3173, 2022 WL 990682, at *3 (D.D.C. Mar. 31, 2022)); *see also Stewart v. United States Dep't of Agric.*, No. 23-cv-1194, 2024 WL 43326218, at *5 (D.D.C. Sept. 27, 2024) (holding that "reprimanding an employee" and "failing to investigate an employee's complaints" were not "adverse employment actions"); *McCann v. D.C.*, No. 23-cv-2398, 2025 WL 958130, at *5 (D.D.C. Mar. 31, 2025) (holding that "disrespectful emails" from a supervisor "that ultimately did not impact [the plaintiff's] employment" did not "independently give rise to a disability discrimination claim"). Moreover, Plaintiff does not attempt to connect any of these incidents to her race, either by identifying similarly situated comparators who were not part of her protected class or otherwise. The Court accordingly dismisses Plaintiff's discrimination claim based on these incidents.

### B.  Retaliation

Defendant also moves to dismiss Plaintiff's retaliation claims for failure to state a claim. To state a Title VII retaliation claim, "a plaintiff must plausibly allege that (1) she engaged in statutorily protected activity, (2) she suffered a materially adverse action by her employer, and (3) the two are causally connected." *Spence v. United States Dep't of Veterans Affs.*, 109 F.4th 531, 539 (D.C. Cir. 2024) (citation modified). Defendant argues that Plaintiff's retaliation claims must be dismissed because none of Plaintiff's allegations amount to "materially adverse actions" and that, regardless, Plaintiff has not alleged a causal connection between such actions and her prior protected activity. *See* Def.'s Mot. at 2. The Court agrees.

The adverse-action standard that governs retaliation claims is different than the one for discrimination claims. To show that an employer retaliated against her, the plaintiff must allege

that she suffered a "materially adverse action," not an "adverse employment action" as with

discrimination claims. *See Ananth*, 2025 WL 973470, at *11 (noting that *Muldrow* did not

change the "materially adverse" standard for retaliation claims); *Bain*, 648 F. Supp. 3d at 55

(same with respect to *Chambers*). "Retaliation claims are 'not limited to discriminatory actions

that affect the terms and conditions of employment' and may extend to harms that are not

workplace-related or employment-related so long as 'a reasonable employee would have found

the challenged action materially adverse.'" *Baloch*, 550 F.3d at 1198 n.4 (quoting *Burlington N.

& Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64, 68 (2006)). In other words, "[a] 'materially

adverse action' is one that would have 'dissuaded a reasonable worker from making or

supporting a charge of discrimination.'" *Bain*, 648 F. Supp. 3d at 55 (quoting *Burlington*, 548

U.S. at 68). The requirement of *material* adversity "separate[s] significant from trivial harms."

*Burlington*, 548 U.S. at 68.

　　　　As for causation, retaliation claims "must be proved according to traditional principles of

but-for causation," which is a higher standard than the "motivating-factor standard" that applies

to discrimination claims. *Wang v. Washington Metro. Area Transit Auth.*, 206 F. Supp. 3d 46, 82

(D.D.C. 2016) (quoting *Nassar*, 570 U.S. at 360). At the pleading stage, the plaintiff must allege

facts suggesting "that the unlawful retaliation would not have occurred in the absence of the

alleged wrongful action or actions of the employer." *Nassar*, 570 U.S. at 360. The plaintiff can

do so "through direct evidence of retaliatory intent or circumstantial evidence showing that (1)

'the employer had knowledge of the employee's protected activity' and (2) 'the adverse action

took place shortly after that activity.'" *Regis v. Noem*, No. 24-cv-2405, 2025 WL 1580808, at *5

(D.D.C. June 4, 2025) (quoting *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985)).

Protected activity under Title VII includes "participati[ng] in a Title VII proceeding" and

"oppos[ing] any discrete practice that [the plaintiff] reasonably could have believed discriminated on the basis of race, color, religion, sex, or national origin." *Morris v. McCarthy*, 825 F.3d 658, 673 (D.C. Cir. 2016).

Turning to the merits, Plaintiff's complaint is often unclear as to which alleged adverse actions form part of Plaintiff's discrimination claims and which form part of her retaliation claims. Nevertheless, even construing the complaint liberally, Plaintiff has not raised retaliation claims based on her allegations that she was forced to resign as Vice President of an affinity group in February 2017 and that she was not selected for a Lead Specialist position around May 15, 2023. Compl. ¶¶ 39, 47. Plaintiff describes two specific instances in which she engaged in protected EEO activities, which Defendant does not dispute. In May 2020, "she opposed discriminatory practices against Black women" in her office. *Id.* ¶ 55. Then, around May 15, 2023, she filed an EEO complaint. *Id.* ¶ 53. Because Defendant's limitation on Plaintiff's affinity-group role predated these activities, it cannot have been imposed as retaliation for the same.[7] Furthermore, Plaintiff alleges that she filed her EEO complaint "on or about" the same day that she was informed of her non-selection for the Lead Specialist position. *See id.* ¶¶ 39, 53. Given that Plaintiff's EEO complaint specifically named the supervisors who interviewed her and informed her she was not selected for the position, *id.* ¶ 56, the only reasonable inference that can be drawn from this set of facts is that Plaintiff filed her EEO complaint *because* of her non-selection, not that she was passed over for the position as retaliation for filing an EEO complaint.

---

[7] Plaintiff's allegation that she "also engaged in protected EEO activities since at least 2017," Compl. ¶ 54, is too conclusory to accept at the motion-to-dismiss stage, and therefore cannot support a retaliation claim based on Plaintiff's 2017 forced-resignation claim.

To the extent Plaintiff seeks to raise retaliation claims premised on her forced-resignation or non-selection allegations, those claims are therefore dismissed. Below, the Court will proceed to assess the viability of Plaintiff's retaliation claims with respect to her remaining allegations of employer misconduct.

### a. Unreasonable Workload

An increase in workload can support a retaliation claim if it is "significant" and might "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *See Burlington*, 548 U.S. at 68 (citation modified); *Bain*, 648 F. Supp. 3d at 55 (citation omitted). Although many of Plaintiff's allegations regarding her "unreasonable workload" evince "some harm" to her working conditions, as discussed above, it is less clear whether the changes in her workload constituted *materially* adverse actions. *See Bain*, 648 F. Supp. 3d at 56 ("[N]ot every undesired change in work assignments or workload constitutes a materially adverse action in the retaliation context."). Plaintiff's allegations that she was assigned "over 50 active cases" since 2020, that she had to work weekends without pay, and that Ms. Solloso and Ms. Phillips emailed her with work assignments while she was on medical leave, *see* Compl. ¶¶ 57, 75–76, fail for lack of factual context. The Court cannot conclude that these were *materially* adverse actions because Plaintiff has not explained how much work those assignments entailed, how it might have been disproportionate, or even how often she had to work weekends. *See Brodetski v. Duffey*, 141 F. Supp. 2d 35, 45 (D.D.C. 2001) ("It is not out of the ordinary for employees to [be] expected to shoulder an extra load on occasion . . . or to [be] asked to step in if there [a]re unexpected staff shortages."). On the other hand, Plaintiff's allegations that supervisor Elizabeth Williams gave her twenty-four hours to research one hundred cases before Plaintiff went on medical leave in September 2023, despite Plaintiff's prior "understanding" that she would have

more time to complete the task, and that Plaintiff was assigned and expected to work on seventeen new cases while on medical leave, *see* Compl. ¶¶ 66–69, 75–79, strike the Court as more patently "onerous," and therefore sufficient at the pleading stage to support Plaintiff's retaliation claim.  *See Bain*, 648 F. Supp. 3d at 55–56 (citations omitted).

Nevertheless, Plaintiff's workload-based retaliation claims must be dismissed because Plaintiff fails to plausibly allege a causal connection between the increases in workload and her engagement in protected activity.  With respect to Plaintiff's alleged heavy workload around the time she took medical leave in September 2023, the sole alleged protected activity that could temporally support an inference of retaliation is her filing of an EEO complaint in May 2023.  *See Farris v. Clinton*, 602 F. Supp. 2d 74, 92 (D.D.C. 2009) ("For temporal proximity between an employer's knowledge of protected activity and an adverse employment action alone to give rise to a reasonable inference of causality, the temporal proximity must be 'very close,' *i.e.*, closer than three or four months." (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001))).  But Plaintiff does not allege that the supervisors responsible for the materially adverse actions she experienced while on medical leave even knew that she had filed an EEO complaint a few months prior.  Indeed, she does not even specify which supervisors assigned her seventeen new cases while on leave.  Similarly, even assuming that the increased workload she experienced "since 2020" constituted a "materially adverse action," Plaintiff does not concretely allege that she engaged in a protected activity in close temporal proximity to that uptick in work or that her supervisors were aware of that activity.

### b.  Denial of Requests for Assistance

As noted above, Plaintiff's allegations regarding her supervisors' denials of her requests for assistance are factually deficient.  Regardless, Plaintiff has not plausibly alleged that her

supervisors denied her requests for assistance in retaliation for engaging in protected EEO activities. She asserts at one point that Ms. Solloso refused to assist her "[o]n or about July 29, 2021, after Plaintiff engaged in prior protected EEO activity." Compl. ¶ 90. But a "mere conclusory statement" such as this one, lacking any detail as to what the activity was or when it occurred, is insufficient to withstand a motion to dismiss. *Iqbal*, 556 U.S. at 678. Furthermore, Plaintiff does not otherwise allege when the other denials of assistance took place, leaving the Court no basis on which to assess temporal proximity to her protected EEO activities. Accordingly, the Court dismisses Plaintiff's retaliation claims based on these allegations.

### c. *Unpleasant Workplace Interactions*

Plaintiff's allegations about unpleasant interactions with her supervisors are not actionable as "materially adverse actions" for purposes of her retaliation claim. Actions like "chastis[ing]," berat[ing]," and yelling, *see* Compl. ¶¶ 63–64, 89–105, are akin to the "occasional name-calling, rude emails, lost tempers and workplace disagreements" that "courts frequently deem uncognizable under Title VII." *Baird v. Gotbaum*, 792 F.3d 166, 171 (D.C. Cir. 2015); *see also Baloch*, 550 F.3d at 1199 ("[S]poradic verbal altercations or disagreements do not qualify as adverse actions for purposes retaliation claims."). Plaintiff's allegation that Ms. Solloso forced her to attend "a formal team meeting" in June 2023, while she was on detail with another team, *see* Compl. ¶¶ 61–64, also falls short. *See Baur v. Crum*, 882 F. Supp. 2d 785, 804 (E.D. Pa. 2012) ("[I]t hardly seems likely that ordering an employee to a meeting . . . even under the threat of possible disciplinary action . . . would constitute a materially adverse employment action that would dissuade a reasonable employee from filing or pursuing a [discrimination] charge."). Furthermore, Plaintiff's conclusory allegations that these incidents happened "after Plaintiff engaged in prior protected EEO activity," *see, e.g.*, Compl. ¶¶ 89, 91, are inadequate to establish

causation.  These discrete claims of alleged retaliatory actions must therefore be dismissed, although they will be assessed in the context of Plaintiff's hostile work environment claim.

Finally, Plaintiff's allegation that Ms. Phillips refused to provide her with copies of a presentation and pop quiz, which Plaintiff needed as evidence for the EEO complaint she had filed a few months prior, *see* Compl. ¶¶ 60, 106–08, is also deficient.  Although "a supervisor's interference with the EEO process" can in some circumstances satisfy the adverse action standard of a retaliation claim, *see Lawson v. Sessions*, 271 F. Supp. 3d 119, 140–41 (D.D.C. 2017), it is not clear that this is what Plaintiff is alleging, as she has not pleaded that Ms. Phillips even knew that Plaintiff needed that information for her EEO complaint.  Thus, this allegation must also be dismissed.

### C.  Hostile Work Environment

To plead a hostile work environment claim, the plaintiff must allege facts showing "that [her] employer subjected [her] to discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Baloch*, 550 F.3d at 1201 (citation modified).  To assess the existence of a hostile work environment, "the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance."  *Id.*  For a work environment to be considered hostile, the offensive conduct must "permeate[] the workplace."  *Stewart v. Evans*, 275 F.3d 1126, 1133 (D.C. Cir. 2002) (citation modified).

Here, Plaintiff's allegations regarding her increased workload, denials of requests for assistance, and unpleasant interactions with her supervisors do not rise to the requisite level of severity or pervasiveness to constitute a hostile work environment.  To start, Plaintiff has alleged

the "same discrete acts" on which her discrimination and retaliation claims are premised to support her hostile working environment claim, which is "disfavor[ed]." *Doe*, 2024 WL 864270, at *7 (quoting *Townsend*, 236 F. Supp. 3d at 312). Although "incidents of disparate treatment *can* establish a hostile work environment," such incidents must be "connected in a pervasive pattern of severe harassment." *Id.* (emphasis added) (quoting *Wade v. District of Columbia*, 780 F. Supp. 2d 1, 19 (D.D.C. 2011)). Even construing Plaintiff's complaint liberally, there is no sign that Plaintiff's alleged employer misconduct is connected in this manner. As discussed above, Plaintiff has not plausibly connected her allegations, besides her discrete forced-resignation and non-selection claims, to her race or her protected activities, which might have indicated such a pattern. *See id.* (holding that the plaintiff's alleged "pattern of specific incidents of disparate treatment and retaliation" that were linked to her race and national origin constituted a hostile work environment). Instead, Plaintiff's allegations describe "the 'ordinary tribulations of the workplace' reflecting an employee's difficult relationship with a supervisor," which are insufficient to support a hostile work environment claim. *Sledge v. D.C.*, 63 F. Supp. 3d 1, 26 (D.D.C. 2014) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). Thus, the Court dismisses Plaintiff's hostile work environment claim.

## V. LEAVE TO AMEND

In her opposition brief, Plaintiff requests leave to amend her complaint to "address any deficiency" in her allegations. *See* Pl.'s Opp'n at 1. Plaintiff has missed her twenty-one-day window to amend her complaint as of right under Federal Rule of Civil Procedure 15(a)(1)(A). Still, the Court may "freely give leave" to amend in all other cases "when justice so requires." Fed. R. Civ. P. 15(a)(2). The problem for Plaintiff, however, is that "an opposition brief is not the proper place to request leave to amend a complaint." *Strum v. Mardam-Bey*, No. 24-cv-401,

2025 WL 405120, at *11 (D.D.C. Feb. 4, 2025) (citation omitted); *see also id.* (noting that Rule 15(a)(2) "applies only when the plaintiff actually has moved for leave to amend the complaint" (citation omitted)).  Without a separate motion and proposed amended pleading, as required under our local rules, the Court cannot evaluate the merits of Plaintiff's request for leave to amend her complaint.  *See id.*  As such, Plaintiff's present request for leave to amend is denied. However, at this early juncture of the case, Plaintiff is free to seek leave to amend her complaint to cure the above-referenced deficiencies in her current allegations.

## VI.  CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss (ECF No. 7) is **GRANTED IN PART AND DENIED IN PART**.  Specifically, the Court dismisses Plaintiff's discrimination, retaliation, and hostile work environment claims, with the exception of her discrimination claims premised on her allegations that she was not selected for a Lead Specialist position in May 2023 and that she was forced to resign from BIG in February 2017.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  October 28, 2025                                 RUDOLPH CONTRERAS
                                                        United States District Judge